## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 27 2017, 10:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jacob H. Miller
Caitlin M. Miller

Hunt, Hassler, Kondras & Miller LLP
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Andrea Ciobanu
Ciobanu Law, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Donald C. Searing, <br> *Appellant-Petitioner*, <br><br> v. <br><br> Karen Vivas, <br> *Appellee-Respondent*. | April 27, 2017 <br><br> Court of Appeals Case No. <br> 84A05-1609-DR-2144 <br><br> Appeal from the Vigo Superior Court <br><br> The Honorable Matthew Headley, Special Judge <br><br> Trial Court Cause No. <br> 84D01-1407-DR-5999 |

**Brown, Judge.**

[1] Donald C. Searing ("Father") appeals the trial court's order granting primary physical custody of the parties' child, C.S., to Karen Vivas ("Mother"). Father raises five issues which we consolidate and restate as whether the court properly awarded physical custody of C.S. to Mother. We affirm.

## Facts and Procedural History

[2] Mother is from Manila, Philippines, Father is from Terre Haute, Indiana, and they met online. The parties married in the Philippines and C.S. was born in the Philippines on November 3, 2010, and is a citizen of both the United States and the Philippines. In a prior appeal, we stated the facts as follows:

> On April 9, 2014, Mother and C.S. left for a six-week vacation to visit family in the Philippines. The couple had been fighting prior to the vacation and, two days into the vacation, Father told Mother he wanted a divorce. Father told Mother that he would continue to support her until she found a job and obtained her own apartment but Mother refused. Mother and C.S. were scheduled to return in May but did not return to the United States until August 25, 2014 when Mother's friends offered Mother and C.S. a place to live in Texas. At some point, Mother and C.S. moved to Michigan, where Mother worked for Meijer, until finally settling in California in December 2014. In the year following the parties' separation, Mother travelled with C.S. to the Philippines, Hong Kong, Texas, Michigan, California, Las Vegas, and Singapore. Mother never received consent from Father to travel with C.S. and often did not inform him of when or where she traveled with C.S.
>
> * * * * *

In November of 2014, Father saw C.S. for the first time since he and Mother left for the Philippines in April. Father became aware that Mother and C.S. were in Michigan after a Michigan CVS called Father regarding a prescription for C.S. Prior to receiving that call, Father did not know that Mother and C.S. had returned to the United States. That weekend, Father drove to Michigan and spent approximately two hours with C.S. at a mall under Mother's supervision. Father had been unable to speak to C.S. for approximately five months prior to this visit. . . .

In December of 2014, Father purchased Christmas gifts for C.S. and made them available for pick-up at a California Walmart near Mother's residence because Mother would not provide an address where the gifts could be shipped. Mother later told Father to cancel the presents because she could not make the drive to the Walmart in time. After the order had been cancelled, Mother took C.S. to pick up the presents and told C.S. that Father did not get him any presents.

*Searing v. Vivas*, No. 84A05-1506-DR-530, slip op. at 3-4 (Ind. Ct. App. Mar. 8, 2016).

[3] Meanwhile, on July 30, 2014, Father filed a petition for dissolution of marriage. *Id.* at 4. Summons was issued by international mail to Mother's address in Manila but was returned indicating that Mother had not been served. *Id.* Father served Mother by publication in November of 2014. *Id.* The trial court held an initial hearing on December 11, 2014, at which Mother was not present. *Id.* At the hearing, the trial court dissolved the parties' marriage, split the parties' debts, indicated that custody could not be determined due to Mother's

absence, and ordered that Father was entitled to parenting time pursuant to the Indiana parenting time guidelines until custody could be determined. *Id.*

[4] On January 12, 2015, Mother requested relief from the judgment and a hearing was set. *Id.* at 5. On January 30, 2015, Father requested an initial custody and support determination. *Id.* On February 20, 2015, the court held a scheduling hearing at which Mother was present by telephone. *Id.* The court set a final hearing for May 4, 2015, and ordered that, because "[Father] has only seen [C.S.] for a few hours in the last ten (10) months," Father be permitted to Skype with C.S. every Saturday and that the parties arrange dates during which Father can fly to California to visit C.S. *Id.* Mother did not agree to any dates for Father's visitation. *Id.*

[5] On March 31, 2015, Father filed a motion for emergency hearing and a verified motion for restraining order as to C.S.'s passport. *Id.* On April 8, 2015, an emergency hearing was held to set dates for Father's visitation. *Id.* The court ordered that Mother would make C.S. available for pick up on April 19, 2015, that Father would pick up C.S. in California on that date and return to Indiana with C.S., and that C.S. would stay with Father until the final hearing on May 4th. *Id.*

[6] The court held a hearing on May 4, 2015, to determine custody and settle all other pending issues. *Id.* at 6. Father submitted several exhibits into evidence including pay stubs, money transfer records, and over 600 text and Facebook messages exchanged between the parties. *Id.* Father submitted a transaction

history of his account with a money transfer service which showed that he sent Mother $2,200 in April and May of 2014 while Mother and C.S. were in the Philippines. *Id.*

On May 27, 2015, the court ordered that Mother have primary physical custody of C.S., that the parties have joint legal custody, and that Father have parenting time. *Id.* at 17-19. On June 1, 2015, Father filed a notice of appeal.

On March 8, 2016, we issued a memorandum decision noting that Mother did not file an appellee's brief and finding that the trial court's conclusions were not supported by the evidence when reviewed under a *prima facie* standard. *Id.* at 2. Father challenged eight of ten findings of fact outlined in the trial court's order, and we addressed the findings found to be dispositive including:

> 8. Divorce under the best of circumstances, especially when children are involved, is difficult at best. Add to the mix that respondent is from another country, from a different culture, and that petitioner chose to reveal his intent to divorce by telephone during his wife's vacation out of the country, and you have the perfect recipe for the disaster which befell this couple during the last twelve (12) months. While the court does not condone any attempt to thwart parenting time or to denigrate another parent in the eyes of a child, what has occurred in this case is at least explainable. Petitioner acknowledges as much in his regret over the timing of his decisions.

> 9. A voluminous amount of text messaging and other internet communications were introduced during the hearing. A number of messages were filled with vitriol, pain, anger and threats. It is noteworthy, however, that a number of communications were not. Indeed, they contained communication you would not

expect between two parties navigating their way through the initial stages of a divorce, custody and support issues. Each side can with equal force pick out messages in support of their own testimony and in opposition to the other's.

10. [Mother] did not deny any of the communications entered into evidence. She explained the regretful ones were fueled by anger, hurt, uncertainty and a desire to protect her son. She also testified that she is fully willing to comply with all court orders regarding custody and parenting time. The court finds these statements credible. Time will tell if faith in [Mother's] word is justified.

*Id.* at 22-23.

We held:

We fail to see how being from a different culture in any way justifies or explains Mother's attempts to thwart parenting time or denigrate Father to C.S. Similarly, although Father may regret the timing of his decision to reveal his desire to divorce Mother while she was in the Philippines, Mother's resulting poor emotional state does not lessen the severity of her yearlong alienation of C.S. from Father. The trial court found that both Mother and Father sent accusatory messages, made regrettable choices, and could "with equal force" pick out evidence supporting their own testimony. However, a thorough review of the messages exchanged between the parties overwhelmingly, if not entirely, supports Father's arguments regarding (1) Mother's alienation of the child from Father by disparaging Father and preventing communication with C.S., (2) Father's monetary support of Mother and C.S., (3) Mother's repeated dishonesty to Father and to the trial court, (4) indications that Mother has been emotionally unstable, and (5) evidence that C.S.'s time with Mother in the past year has had a detrimental effect on C.S. both

mentally and physically. Accordingly, we find that the trial court's findings are unsupported by the evidence.

*Id.* at 23-24.

[10] We agreed with Father that it was in C.S.'s best interest that Father have primary physical custody and that the trial court's determination to the contrary was clearly erroneous. *Id.* at 26. We noted that Mother had provided little stability for C.S. in the year she had custody. *Id.* At the time of the final hearing, Mother was living in California with friends. Her boyfriend, Jon, helped take care of C.S., helped support Mother and C.S., and, according to Mother, had a good relationship with C.S. *Id.* at 28. In discussing the mental and physical health of all individuals involved, we observed Mother frequently told C.S. information about Mother and Father's domestic and legal issues which upset C.S., that C.S. developed a severe rash and blisters over a large area of his buttocks while in Mother's care, that upon being returned to Father a year later in April 2015, Father took C.S. to the doctor where he was diagnosed and treated for scabies, and that C.S. had significant scarring from the untreated scabies. *Id.* at 28-29. We also observed that messages from Mother revealed that she had frequent and severe emotional outbursts and mood swings, had made threats to Father, and frequently fabricated stories. *Id.* at 30.

[11] We observed that the trial court was making an initial custody determination where there is no presumption in favor of either parent. *Id.* at 32. We held that

the best interest analysis overwhelmingly suggested that placement with Father

was in the best interest of the child. *Id.* Specifically, we stated:

> Mother has demonstrated that she is emotionally unstable, has
> provided C.S. with little consistency in his living situation, has
> threatened to leave the country with C.S. permanently to avoid
> the court's jurisdiction, shares inappropriate personal and legal
> information with the child, and does not acknowledge the
> potential deleterious effects her actions may have on C.S[.],
> choosing instead to blame Father for C.S.'s emotional issues.
> Furthermore, Mother failed to provide adequate medical
> treatment for C.S.'s scabies for a year resulting in significant
> scarring.

> \* \* \* \* \*

> Although we give the trial court significant discretion in family
> law matters, there is simply a complete lack of evidence which
> suggests that Mother is better equipped to parent the child and
> that it is in the best interest of the child for Mother to have
> primary physical custody. While there is significant evidence
> that Mother's actions have detrimentally affected C.S. and
> questions regarding her ability to provide a stable home life for
> C.S., there is no substantial evidence that would create any
> similar concerns regarding Father's ability to care for C.S.
> Accordingly, we find that the trial court's conclusions are clearly
> erroneous.

*Id.* at 32-33. We reversed the trial court's order granting physical custody of

C.S. to Mother, ordered that Father be given physical custody of C.S., and

remanded for recalculation of child support obligation.[1] *Id.* at 33-34. The opinion was certified on April 18, 2016.[2]

[12] Meanwhile, on March 21, 2016, Mother filed a Verified Petition to Modify Custody; Request for Hearing, Verified Petition for Temporary Custody of the Minor Child and Proposed Order.[3] On April 13, 2016, the court granted Father's motion for a change of judge.

[13] On July 29, 2016, the court held a hearing. Father testified that he lived in a three-bedroom house he had recently moved to with his wife, Grace, who was pregnant, their youngest son, and his nine-year-old stepdaughter. He testified that he began working at the post office a little over a month earlier, that he accepted the post office position for better income than his previous job, and that his new position enabled him to spend more time with his children. Father testified that he did not believe Mother's mental health had improved and that she exhibited additional unstable or overly emotional activities. Father testified that he had C.S. in April and May, that C.S. had been visiting with Mother for summer visitation, and that the day of the hearing was supposed to be the last day of that visitation. He testified that his attorney advised him at some point

---

[1] Judge Baker dissented and stated that our standard of review compels us to affirm because sufficient evidence and inferences supported the trial court's order. *Searing*, slip op. at 35-37.

[2] The record does not reveal that the trial court ever entered an order granting physical custody of C.S. to Father.

[3] The record does not contain a copy of this petition.

that he had primary physical custody going back to March 8th when this Court issued its opinion.

[14] Mother testified that she lived in a one-bedroom condo in California, was looking for a larger home, but did not have a move-out date yet. She also testified that she married Joe Thomas the previous Sunday, that she had been in a relationship with him for fourteen months, and that she could now provide insurance for C.S. She also testified that C.S. did not go to Indiana for winter parenting time because she could not afford the plane ticket to send him. She stated that she was supposed to pick C.S. up on April 5, 2016, following parenting time in Indiana, but C.S. did not return until the end of May. Father testified that his attorneys informed Mother's attorneys that he was keeping C.S. based upon this Court's decision, and that he deducted $500 from the amount Mother owed him based upon the nonrefundable airline ticket Mother had purchased for April 5, 2016.

[15] On September 2, 2016, the court entered an order awarding physical custody of C.S. to Mother. The order states in part:

> After the May, 2015 Trial Court Order, [Father] properly appealed the decision, and on March 8, 2016, the Court of Appeals issued its decision, reversing the Trial Court's decision. Mother immediately filed for a change of judge and a petition for modification of custody – even before the Appellate Court's time

for certification had run.[4]  Thereafter, [Father] has custody of the child for a short period of time (early April – late May, 2016), and then [Mother] exercised extended parenting time over the summer.  All this is gleamed [sic] from the Trial Court's Order, the Chronological Case Summary, and the Court of Appeal's [sic] decision and this judge's temporary summer order.

There were some motions and argument filed regarding at what point in time this Court could hear evidence from – was it the original Trial Court's Order date forward, or the Court of Appeal's [sic] Order date forward.  It appears to this Special Judge that it must consider evidence since the original Trial Court's decision.  Otherwise, a full (almost) year of what was going on in the child's life would be "lost".  Logically, if something significant happened after the Trial Court's decision, but before the Appellate Court's decision (jail, molestation, new job, re-marriage, mental health commitment, etc.) then the full facts and the full "picture" would not be available.  As such, Court is going to consider all the evidence since the Trial Court's May, 2015 decision.

Facts:

Since that time, both parents and their lives have changed.

1. Residence:

a) Father has moved within the Terre Haute area.  Father's home is now near a railroad track and the reason for moving is

---

[4] The chronological case summary indicates that Father's counsel filed a Motion for Change of Venue from Judge on March 14, 2016.

for a larger house to accommodate their growing family.

b) Mother has moved within the Huntington Beach, Southern California area. Mother and her new husband live in his one bedroom condo, but are looking for a larger space.

2. Job:

a) Father now works for the Post Office.

b) Mother has a new job.

3. Family:

a) Father's family consists of himself, his wife, his wife's 9 year old son,[5] their 2 year old son, their to-be-born[-]anytime child, and [C.S.].

b) Mother's family consists of herself, her new husband Joe, and [C.S.].

4. Schooling:

a) Father has not had the child enrolled in schooling since he assumed custody. He has the child enrolled in daycare, with a family friend – who does not hold a daycare license.

b) Mother had the child in a pre-school, what California calls a "preppy school". His teacher, Tara Holmes, testified that [C.S.]

---

[5] Father testified that C.S. has a nine-year-old stepsister.

was well behaved, well liked, and happy at school.

5.  Spouses:

a)  Father's wife was unable to testify as she was on bed rest with her impending birth of their child.

b)  Mother and her spouse, Joe Thomas, were married shortly before this trial.  They have known each other since July 4, 2015. He is a branch manager at a bank in California.  He has health insurance available for [Mother] and [C.S.] via his employer.  His family is from the Huntington Beach area, and many still remain in that area.  Joe has played a significant role with [C.S.]'s needs.

6.  Spring Break, 2016:

Father had parenting time of the child for this event in Terre Haute.  At the conclusion of this, [Mother] was to fly out and pick up the child, and was actually at the airport about to leave when she learned from her attorney that she would not be getting the child – due to the Court of Appeals' decision.  Father did not call or notify [Mother] of this.  Father admits, in retrospect, that he handled this poorly.  Mother was "out" approximately $500.00 for the plane ticket due to this.

There were a series of text messages around March 21, 2016 in which [Father] was not completely forthcoming about his intent with the return of the child.

7.  Telephone Calls:

Mother is from the Philippines, and English is her second language.  Her spoken English was, at times, difficult to understand.  Mother and [Father] had a telephone conversation

which was played for the Court (see Exhibit 16).  Clearly, [Mother] was quite distraught about the whole custodial situation.

8.  Text Messages:

Approximately 100 pages of text messages were introduced by [Father] at trial.  In [Mother's] text messages, one can observe that her text is similar to listening to a person who has English as a second language.  The text in Exhibit 14, for instance, shows the difficult relationship between [Mother] and step-mother.  It was suppose [sic] to be about the child's medical insurance coverage, but turned into a discussion of [Mother] calling step-mother names, to step-mother bringing [Mother's] nationality into the discussion, and [Mother's] discontent that Grace/[Father's] relationship was the cause of [Mother]/[Father's] marriage break-up.

Other text messages (Exhibit 10) (Exhibit 13) involve disputes about payment/non-payment of child support, and other related disagreements (car loan).

Exhibit 28 details that [Mother] is getting married to Joe and that she didn't tell [Father] that the wedding is interfering with [Father's] skype time with [C.S.].  In another text, [Father] taunts [Mother] about [Mother] not being able to move the case to California.

* * * * *

Conclusion:

There has been a substantial change for the child, and [Father's] family, and [Mother's] family.  Mother has stabilized after

moving to the United States, moving to California (getting stable housing and a job) getting married to a man who she dated for approximately one year (who was significantly involved in the child's life), steady income, obtained schooling for the child, got him to his doctor/dentist appointments – in short did what she should do.

Father's life, too, has changed. He is going to have a newborn, a new job, a new house. Father's focus was more on what [Mother] has done wrong then [sic] what he actually does with, and for, the child.

Here, both parents want custody of the child (obviously) and as [Father] put it, the child would like to be with both [Mother] and [Father] – which just can't happen. Joe is quite involved with the child, as is Joe's family – even before the marriage to [Mother]. The child has obviously adjusted well to his school/school friends in California. Mother appears to be much more stable than before. She was basically homeless, jobless, and on her own. Father wasn't paying support regularly, which is significant for [Mother] at that time. Mother has secured housing, a new husband, and a new job – in short, a new life. She has always provided for the child, getting him enrolled in school, going to doctors' appointments, and taking him for play[.]

Court concludes that it is in the best interest of the child for physical custody of the child to be with [Mother] when considering the factors in I.C. 31-17-2-8 and 31-17-2-21. Father should have extended parenting time with the child. Parties are to share equally for [C.S.]'s cost of flying. Father should have Skye [sic] opportunities with the child each Wednesday and Sunday – 6:00 p.m. California time, if the parties can not agree to a time.

Parties are to submit a Child Support Obligation Worksheet

based on their current incomes, and any child support arrearage calculations (and how to cure said arrearage if there is some) within 30 days of this Order.

Mother shall not take the child out of the country. Passports are to be held by [Father].

Transfer of the child to [Mother] should occur in approximately three (3) weeks from the date of this Order, to get the best flight rate – the weekend of September 23rd.

Appellant's Appendix II at 15-22.

## Discussion

The issue is whether the trial court abused its discretion in granting Mother's petition to modify custody. Father points out that C.S. was with him for only seven weeks as primary physical custodian and there was no meaningful basis upon which to determine whether the existing arrangement was in C.S.'s best interest or should be modified. He asserts that while changes in circumstances in Mother's household may be considered in a best interest analysis, they cannot, standing alone, form the basis of a finding of a substantial change in circumstances necessary to warrant modification of a custody order.

Father further argues that the changes the trial court identified in his household do not justify a modification of custody, and that the trial court failed to consider evidence of Mother's continuation of conduct that this Court discussed and disapproved just five months previously. He asserts that the court erroneously stated that his wife brought Mother's nationality into the discussion

and that he taunted Mother about not being able to transfer the case to California, and that it erred in finding that Mother appeared to be more stable than before. Father also argues that the standard the court erroneously applied was one for initial custody.

[18] Mother contends that Father is asking this Court to reweigh the evidence and judge the credibility of witnesses. She argues that the trial court considered the fact that C.S. spent the majority of his life in Mother's care and custody, that C.S. was intertwined in the Huntington Beach community via his participation in the Preppie K school, and that C.S. has strong ties to his stepfather's extended family.

[19] We review custody modifications for an abuse of discretion and have a "preference for granting latitude and deference to our trial judges in family law matters." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." *Id.* The Indiana Supreme Court explained the reason for this deference in *Kirk*:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should

have found its preponderance or the inferences therefrom to be different from what he did.

*Id.* (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). *See also Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). Therefore, "[o]n appeal it is not enough that the evidence *might* support some other conclusion, but it must positively *require* the conclusion contended for by appellant before there is a basis for reversal." *Steele-Giri*, 51 N.E.3d at 129 (quoting *Kirk*, 770 N.E.2d at 307). In the initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating the existing custody should be altered. *Kirk*, 770 N.E.2d at 307. We may neither reweigh the evidence nor judge the credibility of the witnesses. *Fields v. Fields*, 749 N.E.2d 100, 108 (Ind. Ct. App. 2001), *trans. denied*.

[20] The trial court's findings were entered pursuant to Ind. Trial Rule 52(A) which prohibits a reviewing court on appeal from setting aside the trial court's judgment "unless clearly erroneous." *Dunson v. Dunson*, 769 N.E.2d 1120, 1123 (Ind. 2002). When reviewing the trial court's findings of fact and conclusions thereon, we consider whether the evidence supports the findings and whether the findings support the judgment. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, our review

of the evidence must leave us with the firm conviction that a mistake has been made. *Id.*

[21] The child custody modification statute provides that "[t]he court may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Ind. Code § 31-17-2-8] . . . ." Ind. Code § 31-17-2-21. Ind. Code § 31-17-2-21(c) provides: "The court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 . . . ." Ind. Code § 31-17-2-8 lists the following factors:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

A remarriage by itself does not constitute a change in circumstances sufficient to support a change in custody. *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1257 (Ind. Ct. App. 2010). However, when a subsequent marriage occurs in conjunction with other substantial changes in the factors under Ind. Code § 31-17-2-8, they may constitute a substantial change in circumstances. *Id.* (citing *Bryant v. Bryant*, 693 N.E.2d 976, 979 (Ind. Ct. App. 1998), *reh'g denied*, *trans. denied*).

As noted, we give substantial deference to trial court judges in family law matters. While the evidence *might* have supported denying Mother's petition, such denial was not *required*. Based upon the court's findings and conclusions, including that Mother had stabilized, married, achieved a steady income, acquired stable housing, obtained schooling for C.S., and taken him to his doctor/dentist appointments; the significant involvement of Mother's new

husband in C.S.'s life; and C.S.'s adjustment to his friends and school in California, we cannot say, that the court abused its discretion in determining that Mother demonstrated that a custody modification is in the best interests of C.S. and that there was a substantial change in one of the necessary factors. *See Walker v. Nelson*, 911 N.E.2d 124, 129 (Ind. Ct. App. 2009) (holding that the trial court did not abuse its discretion when it modified custody and noting that, although any one factor may not necessarily warrant a change of custody, consideration of all the factors is sufficient to establish that modification is in the best interests of the child and a substantial change had taken place in the interaction and interrelationship of the child with the child's parents, adjustment to his home and community, and the health of all of the individuals involved); *Barnett v. Barnett*, 447 N.E.2d 1172, 1175 (Ind. Ct. App. 1983) (holding that the trial court did not abuse its discretion in modifying custody considering a number of factors including the relative stability of the parents).[6]

## *Conclusion*

For the foregoing reasons, we affirm the trial court's order.

Affirmed.

Vaidik, C.J., and Bradford, J., concur.

---

[6] We note that, while we reversed the prior award of custody to Mother, the trial court judge entering the second order granting Mother custody was a different trial court judge.